OPINION OF THE COURT
Jill Konviser, J.
Introduction
In January of 2007, the defendant began communicating via computer with an individual whom he later learned was an undercover detective. He met the detective online in a chat room frequented by child pornography enthusiasts. During their communications, the defendant informed the detective that he was attracted to girls between the ages of 6 and 16, and invited the detective to masturbate together while watching child pornography. Also during those communications, the defendant transmitted a still image and a video recording of child pornography to the detective. As a result, a search warrant of the defendant’s work computer was executed, and nine still images of seven separate child victims and 13 video recordings of at least 15 separate child victims, including at least three toddlers,[1] were recovered. Subsequent to his arrest based on the foregoing, the defendant was interviewed on video by the detective and an assistant district attorney (hereinafter ADA). During the interview, the defendant admitted to engaging in sexual intercourse with at least five children.
Procedural History
On June 18, 2007, the defendant entered a plea of guilty to promoting a sexual performance by a child less than 17 years of age, a class D felony offense pursuant to Penal Law § 263.15, in full satisfaction of the indictment pending against him.[2] The de *324 fendant was sentenced to an indeterminate term of imprisonment of 2Vs to 7 years. On September 12, 2011, prior to the defendant’s release from state prison, the Honorable Lewis Bart Stone conducted a Sex Offender Registration Act (SORA) hearing.[3] (See L 1995, ch 192, § 3.) Under SORA, an individual convicted of certain sexual offenses must register as a sex offender with the New York State Board of Examiners of Sex Offenders (hereinafter Board). An offender’s obligations with regard to registration vary according to what risk level is imposed on the offender — level one, two, or three. Those obligations include, inter alla, public dissemination of the offender’s name, address, and photograph. Offenders generally seek to be classified as a level one offender as it involves fewer obligations.
Prior to imposition of a risk level, the sentencing court must conduct a hearing. In anticipation of that hearing, the Board prepares a risk assessment instrument (hereinafter RAI), recommending a risk level to the court. The district attorney may seek a determination that differs from the Board, but must submit an RAI reflecting that determination. The RAI is a scoring sheet designed to determine an offender’s risk of re-offending that assigns a designated number of points to offenders with various characteristics. An offender who scores from 0 to 70 points is presumptively a level one offender, an offender who scores from 75 to 105 points is presumptively a level two offender, and an offender who scores from 110 to 300 points is presumptively a level three offender. The RAI allows the court, however, to depart from the presumptive risk level based on additional evidence presented either by the offender, the Board, or the district attorney.[4]
In the instant matter, the Board prepared an RAI, recommending that the defendant be adjudicated a level one offender based on a score of 45 points. Despite the defendant’s presumptive score, however, the Board recommended an upward departure to level three based on several factors not taken into account by the RAI. The People prepared their own RAI, recommending that the defendant be adjudicated a level two offender based on a score of 105 points. The People also recommended *325 an upward departure to level three. The defendant, on the other hand, argued that he should be scored 45 points, making him a presumptive level one offender. In the alternative, and if the court did not find him to be a presumptive level one offender, the defendant requested a downward departure to a level one. Justice Stone issued a written decision on December 12, 2011, adjudicating the defendant a level two sex offender based on a score of 95 points. The court declined to grant either an upward or downward departure.
On June 1, 2012, the Board issued a position statement regarding the RAI in child pornography cases, related to risk factor 3 — number of victims — and risk factor 7 — relationship with victim. While the Board acknowledged that existing case law holds that offenders in child pornography cases may properly be assessed points under risk factors 3 and 7, it concluded, however, that this approach, in certain situations, “produces an unintended, anomalous result as the majority of offenders of child pornography offenses will be scored the same when there are clearly vast differences amongst these types of offenders” (NY St Bd of Examiners of Sex Offenders, Scoring of Child Pornography Cases Position Statement 611/12 at 1). In order to address this result, the Board indicated that it will generally depart upward from the presumptive risk level in these types of cases based upon several factors, including, inter alla, the number of images possessed, the length of time the offender has been collecting and/or viewing child pornography, allegations regarding sexual contact with children, the nature of the images, such as “sadomasochistic” images, and “reinforcement of deviant sexual arousal to children” by evidence that the offender has masturbated to child pornography (id.).
Based on the Board’s position statement, the defendant moved this court pursuant to CPLR 2221 to revise his risk level, arguing that the position statement constituted a change in the law, thereby entitling him to said revision. The People opposed the defendant’s motion. While the defendant’s motion was pending before this court, the First Department issued a decision in People v Ascher (106 AD3d 448 [1st Dept 2013]), a case involving the possession of a sexual performance of a child. In Ascher, the SORA hearing court assessed the defendant points, inter alla, under risk factor 7 — stranger relationship to victim. Subsequent to the hearing court’s adjudication of the defendant as a level two offender, the Board issued its position statement. On appeal, the First Department noted that the Board’s posi *326 tian statement was an effort to “provide a more accurate determination of an offender’s risk of recidivism and threat to public safety.” (Id. at 448.) While the First Department did not specifically address whether the Board’s position statement constituted a change in law, it did find that in light of the statement, it was appropriate for the hearing court to reevaluate the defendant’s risk level adjudication. The Ascher Court, therefore, remanded the matter for a de nova risk level determination. Based on the Ascher decision, this court issued a written decision on May 14, 2013, ordering a de nova SORA hearing in the instant matter. That hearing was held on June 5, 2013.
The De Novo SORA Hearing
At the de nova SORA hearing, the People recommended that the defendant be scored 30 points under risk factor 3 — number of victims, 30 points under risk factor 5 — age of victim, and 15 points under risk factor 9 — number and nature of prior crimes.[5] Having scored a total of 75 points, the People contended that the defendant was a presumptive level two sex offender. Nevertheless, the People recommended an upward departure to a level three sex offender, based on the defendant’s admissions at the time of his arrest that he had engaged in sexual intercourse with several children, a fact not taken into account by the risk assessment instrument. The defendant conceded that he should be scored under risk factors 5 and 9, but objected to being scored 30 points under risk factor 3, in light of the Board’s position statement. Additionally, the defendant objected to the People’s argument for an upward departure to a level three, contending that the hearing was a modification hearing only, and not a de nova hearing, and that Justice Stone had previously determined that the People had failed to demonstrate by clear and convincing evidence that an upward departure was warranted. Finally, the defendant argued for a downward departure based on the defendant’s age and health.
The Video Recordings
The People provided the court with a CD containing 13 video recordings of at least 15 separate child victims, including at *327 least three toddlers,[6] possessed by the defendant. The court reviewed each video recording contained on the CD, in camera. The video recordings irrefutably depict multiple female child victims, ranging in age from toddler to young teen, in various positions of molestation and degradation. Although a brief description of each video recording follows, to be clear, the words used here to describe the repeated sexual victimization of multiple children, including the rape and assault of several toddlers, can not sufficiently portray the inhumanity and horror of these videos. Indeed, the cold record alone fails to describe adequately the depravity of the content of the numerous videos possessed and enjoyed by the defendant. Video No. 1 is a relatively short, high-quality video recording, entitled, “Teen Fuck.” In the video, an adult male, whose face is not visible, engages in sexual intercourse with a young teenage girl, whose face is visible. The victim has a pained expression on her face. The adult male holds the victim’s legs open and touches her vagina while engaging in vaginal intercourse with her. Video No. 2, entitled, “9y lly girls pedo sex kinder piss pee,” is a rather lengthy recording, depicting two prepubescent girls outdoors, engaged in various sexual acts. Each victim’s face is visible throughout the recording. In the first portion of the video, both children are naked. The younger victim touches the older victim’s vagina and puts her mouth to the older victim’s developing breasts. The older victim, although also a child, is then videoed, close up, leaning against a wall with her legs spread, repeatedly putting her fingers into her own vagina. Then, the younger victim, wearing a shirt, but naked from the waste down, is recorded crouched down and urinating several times. The video zooms in on the victim’s hairless vagina repeatedly, and shows the victim spreading open her vagina with her fingers for the camera. The younger victim is then recorded kissing the older victim’s vagina. Finally, the camera records, close up, the older victim placing an object, appearing to be a cigarette butt, into the younger child’s vagina. In video No. 3, entitled, “66,” a toddler, is shown naked, lying down on her back on a blanket. Her face is clearly visible. An adult female, also naked, kisses the toddler’s belly and then performs oral sex on the toddler. While the adult female is licking the toddler’s vagina, the camera zooms in on the toddler’s vagina. The video then shows an adult male raping what appears to be the same *328 toddler. The man holds the toddler’s legs spread open and repeatedly forces his penis into the toddler’s vagina. Video No. 4, entitled, “212 yrspread,” shows a prepubescent girl in various sexual poses.[7] Throughout the video, she appears to be listening to the camera person’s instructions. Her face is clearly visible. It begins with the victim wearing a shirt, and black thigh-high stockings, but no underwear. She is reclined on a bed with her legs open, her hairless vagina clearly visible. The victim then turns over on her stomach, spreads her legs, and holds her buttocks and vagina open. The camera zooms in on her vagina and buttocks. The victim then lies on her back, with her legs over her head, and opens her vagina with her fingers. The camera zooms in on her vagina. The child then takes her shirt off and touches her chest. Her breasts are not yet developed. The camera zooms in on her chest as she is touching herself. The victim then stands on the bed with her hands on her hips, and twirls for the camera. She appears shy and self-conscious as she poses for the camera. Video No. 5, entitled, “daddy love me,” is a high-quality, seemingly choreographed video production. The video begins with a prepubescent girl, wearing a tank top and panties, seated on an ottoman, helping an adult male remove his jeans and underwear. Both the victim’s and man’s faces are visible at different times during the video. The child first sucks the man’s penis. The man then takes off the victim’s shirt and touches her undeveloped breasts. The man then takes off the victim’s panties and puts his mouth to her undeveloped breasts. He picks up the victim, holds her in the air over his shoulders, and performs oral sex on her. While he licks her vagina, she is required to suck his penis simultaneously as she is hanging upside down. Throughout the video, the camera records from different angles and repeatedly zooms in on the victim as she is performing oral sex on the man. Video No. 6, entitled, “Early Vicky,” depicts the same victim as video No. 4. In video No. 6, the victim, presumably Vicky, appears to be much younger than in video No. 4. The rather lengthy video depicts various scenes, including scenes depicting other child victims. It begins with Vicky, who is clothed, lying on a bed, looking at pornography handed to her by an adult male, who is *329 mostly off-camera.[8] A different clip shows a clad Vicky, lying on the same bed looking at pornography, this time with an adult male lying next to her. Interspersed is a brief video, seemingly recorded surreptitiously, of a young girl in a bedroom, changing her clothes. The very young victim is briefly naked. The video then returns to a naked Vicky, with a naked adult male on a bed. The man hugs and holds her. Next, the video shows a naked adult male, sitting on a bed, with a naked Vicky, looking at pornography. The video then shows a girl, lying on her stomach. While her face is not visible, the location suggests that the girl is Vicky. An adult male with a naked, erect penis, stands behind her and inserts his finger into her anus, repeatedly. The camera then zooms in on the girl’s anus, as a penis is inserted into it. Next, the child, lying on her back, holding her legs and buttocks open, touches her anus with her fingers while the camera zooms in. The video then shows Vicky, who is naked, performing oral sex on a naked adult male, who is reclined on a bed. The next clip again shows Vicky, who is naked, performing oral sex on a naked adult male, as she looks off towards the camera. Vicky’s expression is blank. Vicky is lying on a bed, while the man stands in front of her. The video shows another clip of a naked Vicky, who is kneeling, performing oral sex on an adult male. The video is then interrupted by a title page, indicating, “Vicky’s first taste of cum.” A naked Vicky, in pigtails, kneeling, performs oral sex on an adult male. The man ejaculates into Vicky’s mouth. The video is in slow motion as the man ejaculates. Vicky does not react; she appears numb. The video then shows a very young Vicky sitting on a bed next to an adult male who masturbates while looking at pornography. Next, the video shows a very young Vicky clad in pajamas sitting on a bed next to an adult male, who is masturbating while looking at pornography. The man places Vicky’s hands on his penis and appears to teach her how to manipulate his penis. The man then stands up next to Vicky while he continues to masturbate. He hands Vicky a cloth to hold as he ejaculates onto it. The video then shows a young, naked girl lying on bed. While you can’t see her face, her hair is visible, and the location suggests that she is Vicky. Vicky is lying on a bed with her legs spread while an adult male strokes her vagina. The man then places his mouth to her vagina and performs oral sex on her. Video No. 7, entitled, “growing up,” contains two separate clips. *330 The video begins with a female toddler performing oral sex on an adult male. The toddler’s face is visible, but the adult male’s is not. The toddler’s face is void of any expression. The second clip shows an adult male having sexual intercourse with a young girl, whose breasts have not yet developed. The victim is seated on the male’s lap, with her back to him, facing the camera. Neither the victim’s nor the male’s face can be seen. Video No. 8, entitled, “hell yes,” shows a toddler, wearing only underwear, being held down on her back. The toddler is wearing a black mask that covers her entire face and head, with holes only for her eyes and mouth. A similarly masked adult male kisses the toddler on the mouth, repeatedly inserting his tongue into her mouth. The toddler is apparently hesitant to keep her mouth open as the man continues to force his tongue into it. When the toddler tries to turn her head away, the man forcibly turns it back towards him, and holds it in place so that he can continue to kiss her. The masked toddler squirms, and appears to be crying. She tries to take the mask off, but the man forces her hands away and readjusts her mask. The man then spreads the toddler’s legs apart and forcibly holds them open. He puts his mouth to the toddler’s vagina and performs oral sex on her. The man then forcibly opens and raises the toddler’s legs, pushes her underwear to the side and shows the child’s buttocks to the camera while squeezing her buttocks. Next, he puts his full grown penis into the squirming toddler’s mouth while touching her chest, and as she is held down. He then places the toddler’s hands on his penis and again forces his penis into the toddler’s mouth. The toddler continues to squirm, and the man holds her head in place and forcibly inserts his penis into her mouth. Video No. 9, entitled, “kty daddy cum pussy,” shows what appears to be a young, naked child, who has not yet developed breasts, lying on her back with her legs spread apart, holding open her vagina. An adult male’s penis ejaculates onto the child’s vaginal area. The camera then zooms in on the child’s vagina and the ejaculate. Video No. 10, entitled, “PEDO-y” depicts Vicky, the same victim as in videos Nos. 4 and 6, in multiple clips. The video begins with Vicky undressing for the camera. She removes her shirt and skirt, and twirls for the camera in her bra and panties. She then removes her bra and panties and again twirls for the camera. Each time she twirls for the camera, she appears to be extremely self-conscious. Clad in only black thigh high stockings, she then kneels in front of the camera. The next clip shows Vicky, on her hands and knees, *331 in bondage. She is wearing a black mask that covers a portion of her face. She is bound at the neck, wrists and ankles, and her ankles are tied to the binding at her neck. Other than white thigh high stockings, she is naked. An adult male places a dildo into her mouth, while pressing his penis against her face.[9] She appears to be hesitant to open her mouth, and the man forcibly inserts the dildo into it. He then pushes the dildo in and out of her mouth. The man next forces his penis into her mouth, and forces her hands around his penis. He holds the back of her head while he thrusts his penis into her mouth. While she is forced to suck his penis, he adjusts the camera angle. Vicky then appears on a bed, clad only in black thigh highs. While performing a bridge pose, the camera zooms in on her vagina. She then turns on her back, and an adult male stands next to her while she performs oral sex on him. The camera zooms in on her mouth. In the next clip, a slightly older Vicky, but still a child, is lying on a bed, clad only in thigh high black stockings. Her legs are spread, and her vagina is clearly visible. She appears to be talking to someone off-camera while an adult male strokes her vagina with his hand. Vicky seems to be completely desensitized, barely acknowledging that an adult male is touching her vagina. The video then shows a younger Vicky lying naked on a bed licking an adult male’s penis while he masturbates. She strokes the man’s penis as he continues to masturbate. He then forces her head to his penis and ejaculates into her mouth. Vicky shows no reaction. The next three clips show Vicky, naked, in different positions, and at different ages, performing oral sex on an adult male. In the next clip, Vicky is lying on her back with her legs spread while an adult male applies Vaseline to her anus. She then puts her finger into her own anus. The next part of the video is extremely grainy and it is difficult to discern what is taking place. The camera does appear to zoom in, however, on a young girl’s vagina. The next portion is also grainy, but appears to be a young girl masturbating. The video then shows a young girl on her knees with her back to the camera, while an adult male with an erect penis stands next to her and inserts his finger into her anus. Next, there are several close-ups of relatively brief sexual contact between an adult male and young girls. In one, an adult male forces his penis into a young girl’s anus. In the next one, an adult male engages in anal sex with another young girl. Finally, *332 the video, again extremely grainy, appears to show a young girl surreptitiously recorded taking a bath. Video No. 11, entitled, “Web Cam Orgasm,” shows a young teenager masturbating and having an orgasm. Video No. 12, entitled, “Y Vid,” shows an adult male engaging in sexual intercourse with what appears to be a young child. The camera zooms in on the man’s penis inserted into the child’s vagina, and the man uses his fingers to widen the small child’s vagina. Video No. 13, entitled, “Young,” shows an adult male engaging in sexual intercourse with a young teen. In the first portion of the video, the child is on her stomach with the adult male behind her. The video zooms in and out, and records, from different angles, the man thrusting his penis into the girl’s vagina. In the second portion of the video, the child is on the man’s lap, with her back to him, facing the camera. Again, the camera zooms in and out, and records, from different angles, the man thrusting his penis into the girl’s vagina.
The Still Images
The People provided the court with a CD containing nine still images of seven separate child victims possessed by the defendant. The court reviewed each image contained on the CD, in camera. Each image irrefutably depicts a young girl posing for the camera. In each image, the victim’s face is clearly visible. A brief description of each image follows. Image No. 1 depicts a young teenager with pink barrettes in her hair, posing for the camera, naked from the waist up, clad in red lace panties. The victim’s developing breasts are the focal point of the image. Image No. 2 depicts a prepubescent girl posing for the camera, entirely nude. The victim’s developing breasts and hairless vagina are clearly visible. Image Nos. 3, 4, and 5, each entitled, “Jessy,” depict a prepubescent girl, entirely nude, posing for the camera in three different positions. In image No. 3, the victim is sitting on the edge of a couch with her legs spread. Her developing breasts are clearly visible and a portion of her hairless vagina is visible. In image No. 4, the victim is reclined on a bed with her legs open. The entirety of her vagina is visible, although her locks cover portions of her developing breasts. In image No. 5, the victim is leaning back on a bed with her legs open. The entirety of her vagina is visible, but her locks again cover portions of her developing breasts. Image No. 6 depicts a young teenager posing for the camera in a bedroom. The victim is wearing a shirt, which is open to reveal her developing breasts, and panties. Image No. 7 depicts a young, nude prepubescent girl, wearing a white barrette, lying outdoors on grass. *333 The victim’s breasts are not yet developed. Her legs are spread, revealing the entirety of her hairless vagina. Image No. 8 depicts a young, prepubescent girl, standing outside. Her breasts are not yet developed. She is eating an ice cream cone in a suggestive manner and looking at the camera. Image No. 9 depicts a prepubescent girl reclining on a bed, propped up on a pillow. She is entirely nude. The victim’s legs are spread, and her hand covers her vaginal area.
The Court’s Findings
As a preliminary matter, this court rejects the defendant’s argument that the hearing was confined to a modification hearing only. Indeed, the court explicitly ruled that a de nova hearing was required, based on the First Department’s decision in People v Ascher (106 AD3d 448 [1st Dept 2013]). In Ascher, the Court held that in light of the Board’s position statement, the defendant was entitled to a reevaluation of his risk level, via a de nova risk assessment hearing. The Court noted that a de nova hearing was appropriate, as the Board, in its position statement, set forth a number of factors to be considered in determining whether an upward departure is warranted, in an effort to avoid scoring all possessors of child pornography in the same manner. A de nova hearing was, therefore, required in the instant matter in order to take into consideration the aggravating factors specifically outlined by the Board.
To begin, the court finds that the People have demonstrated by clear and convincing evidence that the defendant should be scored with 30 points under risk factor 3 — number of victims, for three or more victims. It is well-settled that children depicted in pornographic images or videos may be considered as multiple, separate victims. (See People v Johnson, 11 NY3d 416 [2008]; People v Fazio, 106 AD3d 1291 [3d Dept 2013]; People v Poole, 90 AD3d 1550 [4th Dept 2011].) This court has reviewed the CD containing nine still images of seven separate child victims and 13 video recordings of at least 15 separate child victims, including at least three toddlers.[10] The still images and video recordings in this case were created to satisfy this defendant’s sexual appetite. He is their target market, and these children were brutalized for him. All told, the defendant is substantially responsible for the victimization of at least 22 children, including at least three toddlers, and is, therefore, appropriately scored 30 points for having victimized three or more children.
*334 As the defendant conceded at the hearing, the People also demonstrated by clear and convincing evidence that he should be scored with 30 points under risk factor 5 — age of victim, for victimizing a child who was 10 years old or less. Again, this court has reviewed the CD containing the still images and video recordings. The 13 video recordings depict the sexual victimization of at least three toddlers, clearly children under the age of 10. Contrary to the defendant’s contention, the imposition of points under both risk factors 3 and 5 does not result in what is often referred to as “double counting.” (See e.g. People v Caban, 61 AD3d 834 [2d Dept 2009]; People v Johnson, 37 AD3d 343 [1st Dept 2007].) It is well-settled that an offender may be scored points for both risk factors 3 and 5. (See People v Leach, 106 AD3d 1387 [3d Dept 2013]; People v DeDona, 102 AD3d 58 [2d Dept 2012]; People v Bretan, 84 AD3d 906 [2d Dept 2011]; People v Perahia, 57 AD3d 865 [2d Dept 2008].) In the instant matter, the defendant possessed still images and video recordings of at least 22 child victims in total, at least three of whom were toddlers under the age of 10. Clearly then, the defendant victimized well in excess of the three victims required for a score of 30 points under risk factor 3, without even including the three toddlers for whom the defendant was scored with 30 points under risk factor 5. He is, therefore, appropriately scored with 30 points under risk factor 5.
Additionally, as the defendant conceded at the hearing, the People demonstrated by clear and convincing evidence that the defendant should be scored with 15 points under risk factor 9 — number and nature of prior crimes, based on a prior conviction for the nonviolent felony offense of attempted possession of a forged instrument in the second degree. Based, therefore, on the foregoing, the defendant is a presumptive level two offender.
Upward Departure
Although the defendant is a presumptive level two offender, the People have demonstrated by clear and convincing evidence that an upward departure to level three is warranted based on the defendant’s admissions to sexual intercourse with at least five children.[11] An upward departure is warranted where “there exists an aggravating . . . factor of a kind, or to a degree, that is otherwise not adequately taken into account by the guidelines.” (People v Johnson, 11 NY3d 416, 421 [2008] [cita *335 tians omitted.]; see People v Yomtov, 105 AD3d 422 [1st Dept 2013]; People v Mantilla, 70 AD3d 477 [1st Dept 2010].) The People must demonstrate that an upward departure is warranted by clear and convincing evidence. (See People v Wyatt, 89 AD3d 112 [2d Dept 2011].)
The defendant unequivocally admitted during a videotaped statement to an ADA and detective at the District Attorney’s office following his arrest, that he engaged in sexual intercourse with five girls under the age of 18.[12] By his own admission to sexual contact with at least five minors, the defendant demonstrated a willingness to act on his depraved fantasies. (See People v Blackman, 78 AD3d 803 [2d Dept 2010].) This court reviewed the entirety of the defendant’s statement, over three hours long, and finds that the statement has sufficient indicia of reliability. Indeed, the defendant’s demeanor never changed from discussing the crimes for which he was arrested, to his admissions to prior sexual contact with children. Throughout the course of the videotape, the defendant was forthcoming and cooperative, and never refused to answer a question. Moreover, the defendant answered the questions posed to him with no hesitation. With regard to his prior sexual contact with children, the defendant engaged in a lengthy discussion regarding those encounters and was able to provide a significant amount of detail, despite the passage of, in some cases, at least two years. The defendant admitted, “I know I had sex with five girls” under the age of 18, whom he had met online, and whom were between 13 and 17 years old. He explained that one of the girls was “skinny,” but that all of the others had “baby fat.” He added that all of the girls “were enjoying it” and “wanted it,” that he “had doggy sex with all of them,” that he “came after five minutes” each time, and that “they laughed at him.” According to the defendant, two or three of the children asked him for “anal sex.” He added that the children were “all pretty girls looking to meet men,” to “have a good time,” and that they were “willing to do what it takes.” The defendant explained that he was surprised by how “simple and gullible” the girls were and added that they “need[ed] help.” He described a 16 year old whom he had sexual intercourse with as pretty, five *336 foot two, thin, with dirty blond hair, who lived with her parents. He described a 13 year old whom he engaged in sexual intercourse with, “doggy style,” as being named either Eileen or Ellen, blonde, cute, and from Staten Island, who was wearing a red plaid jacket when he met her. He described one of the girls, Angela, as having a “stocky build” with a “round face.” Another 16-year-old girl whom he raped, he described as “cute,” “stocky,” and added that she went to school on the east side of Manhattan and had a younger brother. He described a 17 year old from Manhattan whom he had sexual intercourse with as having a “nice body,” being “very good-looking,” “heavy in the hips” with “nice shoulders and chest.” She lived around 23rd Street and told him that she wanted to attend the Fashion Institute of Technology. The defendant explained that he stopped having sexual intercourse with children and switched to adult prostitutes because he was embarrassed by his sexual performance, and prostitutes “don’t make fun of you.” Towards the end of the interview, the defendant assured the ADA and detective that “I did all the things I told you.” “Everything’s the truth.” “I performed [those] sexual acts.”
While the court concludes that the defendant’s admission to sexual intercourse with at least five children alone warrants an upward departure, there are additional significant aggravating factors warranting such a departure.[13] Indeed, as specifically outlined in the Board’s position statement, the court finds that an upward departure is warranted based on the nature of the images possessed by the defendant, including a video clip showing the sadomasochistic abuse of a young girl, and evidence of the defendant’s deviant sexual arousal towards children as demonstrated by his online conversations with an undercover detective, in which he invited the detective to masturbate together while watching child pornography.
An upward departure is also warranted based on the nature of the child pornography possessed by the defendant. The defendant possessed not only still images, but multiple video recordings of children being brutally and repeatedly sexually assaulted, sometimes over the course of several years. Many of the videos are rather lengthy, and show the sexual abuse of multiple child victims. At least two of the videos are high-quality produc *337 tians with an individual filming the abuse while the child victim is being sexually assaulted by an adult male. Moreover, at least one of the video recordings shows the sadomasochistic abuse of a child victim. In that particular video, the child victim, who is wearing a black mask, is bound around her neck, wrists, and ankles, with her ankles tied to the binding around her neck. An adult male forces a dildo, and later, his penis into her mouth, and holds her head while he repeatedly forces his penis into her mouth.
Moreover, the defendant did more than merely possess the still images and video recordings. According to the case summary prepared by the Board, the defendant engaged in numerous conversations with an undercover police detective over the Internet regarding child pornography.[14] During those conversations, the defendant told the detective that he was attracted to girls between the ages of 6 and 16. The defendant also asked the detective to meet him so that the two could masturbate together while watching child pornography. Additionally, according to the defendant’s plea allocution, he disseminated at least one still image depicting a naked child victim, and one video recording showing an adult male having sexual intercourse with a child victim, by sending the image and recording to the detective over the Internet.[15] The defendant’s actions, far beyond mere possession of child pornography, demonstrate to this court that the defendant is willing to carry out his depraved fantasies, thereby warranting an upward departure.
Based on the foregoing, therefore, the court finds that the defendant is a level three sex offender. The defendant unquestionably contributed to the exploitation and abuse of numerous child victims. The still images and video recordings in his possession were produced for depraved consumers like this defendant. What the images and videos do not show is the emotional pain and psychological scarring of the child victims, particularly of a masked, crying toddler struggling to avoid her captors as they sexually exploit and abuse her young body. If words could describe the depravity demonstrated by the video recording of the horrific sexual abuse of multiple children, there *338 would be a higher level of registration and scrutiny for this defendant, which he has richly earned. In the absence of such a level, this court unequivocally, and without hesitation, finds that the defendant is appropriately scored as a level three offender. Society is entitled to the highest level of protection from this defendant.
Downward Departure
The defendant failed to convince this court that he is entitled to a downward departure based on his age and health. A downward departure is warranted where there exists a “mitigating factor of a kind, or to a degree, that is otherwise not adequately taken into account by the guidelines.” (People v King, 74 AD3d 1162, 1163 [2d Dept 2010] [citations omitted]; People v Fareira, 80 AD3d 589 [2d Dept 2011].) The defendant must demonstrate that a downward departure is warranted by a preponderance of the evidence. (See People v Washington, 105 AD3d 724 [2d Dept 2013]; People v Martinez, 104 AD3d 924 [2d Dept 2013]; People v Peeples, 98 AD3d 491 [2d Dept 2012].)
First, a debilitating medical condition may support a downward departure as it tends to suggest that an individual is less likely to offend. (See People v Stevens, 55 AD3d 892 [2d Dept 2008]; People v Adams, 44 AD3d 1020 [2d Dept 2007].) Such is not necessarily the case in possession of child pornography cases, where no physical activity is required. (See People v Curthoys, 77 AD3d 1215 [3d Dept 2010].)[16] So, too, while advanced age may support a downward departure, age alone is not dispositive. (See People v Burton, 71 AD3d 468 [1st Dept 2010]; People v Johnson, 44 AD3d 571 [1st Dept 2007]; People v Harrison, 74 AD3d 688 [1st Dept 2010]; People v Beyah, 76 AD3d 917 [1st Dept 2010].) Indeed, in the instant matter, the defendant committed the offenses at age 49. At the time of the hearing, he was 55 years old, hardly the “advanced age,” he claims. Quite simply, in the context of this child pornography case, the defendant has failed to demonstrate that his age warrants a downward departure. (See People v Gajadhar, 103 AD3d 572 [1st Dept 2013]; People v Thomas, 105 AD3d 640 [1st Dept 2013]; People v Cabrera, 91 AD3d 479 [1st Dept 2012].)
Conclusion
The defendant is adjudicated a level three sex offender.

. It is difficult to discern the age of one of the victimized toddlers, who may very well be an infant.

. The defendant was charged in a 24-count indictment that included an additional count of promoting a sexual performance by a child less than 17 years of age, as well as 22 counts of possessing a sexual performance by a *324 child, class E felony offenses pursuant to Penal Law § 263.16, commonly referred to as possession of child pornography.

. Justice Stone has since retired.

. While not relevant here, the court must also determine whether a defendant is a sexually violent offender, predicate sex offender, or sexual predator. These characteristics further impact an offender’s reporting obligations.

. At the hearing, the People provided the court with a DVD containing nine still images of seven separate child victims and 13 video recordings of at least 15 separate child victims, including at least three toddlers, in the defendant’s possession, that formed the basis of the instant indictment.

. As indicated earlier, one of the toddlers, whose age is difficult to discern, may very well be an infant.

. The victim recorded in video No. 4 also appears in videos No. 6 and No. 10. The videos depict the sexual abuse of Vicky over the course of several years, as she develops from a young child into a preteen.

. As the adult male’s face is never shown, it is unclear whether it is the same adult male who abuses Vicky throughout the video, or multiple men.

. Again, as the adult male’s face is never shown, it is unclear whether it is the same adult male who abuses Vicky throughout the video.

. Again, one of the toddlers may actually he an infant.

. Notably, in its June 1, 2012 position statement, the Board indicated that a departure from an offender’s presumptive risk level is appropriate under these exact circumstances.

. It is well-settled that a defendant’s admissions to other sexual offenses is a proper basis for an upward departure, even when the defendant was never charged with or indicted for those offenses. (See People v Jenkins, 34 AD3d 352 [1st Dept 2006]; People v Howe, 49 AD3d 1302 [4th Dept 2008]; People v Seils, 28 AD3d 1158 [4th Dept 2006].)

. Even had the People failed to demonstrate by clear and convincing evidence that an upward departure is warranted, the court has the discretion to reach its own conclusion. (See People v Mingo, 12 NY3d 563 [2009]; People v Poole, 105 AD3d 654 [1st Dept 2013].)

. A case summary prepared by the Board constitutes reliable hearsay, and a court is entitled to rely on the summary in determining a defendant’s risk level. (See People v Mingo, 12 NY3d 563 [2009].)

. At a SORA hearing, admissions made during a plea allocution are clear and convincing evidence of the facts admitted to, and a court is entitled to rely on the admissions in determining a defendant’s risk level. (See People v Jack, 15 AD3d 270 [1st Dept 2005].)

. Notably, during the course of the hearing, defense counsel represented to the court that the defendant is employed. Clearly, then, his health is not as debilitating as he would lead the court to believe.